IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

WILLIAM A. COOPER

v.  :  Civil No. CCB-14-1373

MICROS SYSTEMS, INC.

## MEMORANDUM

Now pending before the court is the defendant's motion for summary judgment. Plaintiff William A. Cooper ("Cooper") has sued MICROS Systems, Inc. ("MICROS") for violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, Maryland's Fair Employment Practices Act, Md. Code Ann., State Gov't § 20-600 *et seq.*, and Howard County law, Howard Cty., Md., Code of Ordinances § 12.208, alleging employment discrimination on the basis of gender identity. The issues in this case have been fully briefed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2014). For the reasons stated below, the defendant's motion will be granted.

## BACKGROUND

At the time of his termination, Cooper had worked for MICROS for approximately twenty-five years, (Mot. Summ. J. Ex. 1, Cooper Dep. 275, ECF No. 32-2), mostly as a business analyst, (Resp. Opp'n Mot. Summ. J. Ex. 5, Cooper Aff. ¶ 1, ECF No. 33-10). In 2010, Cooper was "diagnosed as a transgendered person." (*Id.* ¶ 8.) Until 2013, Cooper had told only one co-worker, Heather Connor, about his diagnosis, although Cooper believes other co-workers suspected he was transgender. (*Id.* ¶¶ 9-13.) In 2013, Cooper told two other MICROS employees he was transgender. He informed his direct supervisor, Jason Looper ("Looper"), on February 2, 2013. (*Id.* ¶ 31.) Cooper asked Looper to keep the information confidential, and Looper said he

1

would. (Cooper Dep. 44.) Cooper told Debra McIntyre ("McIntyre"), MICROS's vice president of human resources, he was transgender on February 12, 2013, as she investigated an incident involving Cooper and a co-worker that ultimately would lead to Cooper's termination. (Cooper Aff. ¶¶ 47, 49.) During this time period, Cooper grew out his hair, (Cooper Dep. 147, 148), but continued to dress as a man, used the men's room, and "tried not to act like a girl," (*id.* at 40, 46).

Cooper alleges that on November 15, 2010, a co-worker, Patrick Ogbenna ("Ogbenna"), came to Cooper's cubicle and said he would rape Cooper. (Cooper Aff. ¶¶ 15-16.) Cooper claims that Ogbenna threatened Cooper because he is transgender. (*Id.* ¶ 18.) Cooper did not report the incident to Looper until 2011. (*Id.* ¶¶ 16-17.) Cooper also alleges that, at various points while they were co-workers, Ogbenna would enter Cooper's cubicle and poke him in the arm, chest, and back.[1] (*Id.* ¶ 14; *see also* Cooper Dep. 232-35.) On or about January 2012, Looper conducted a meeting with Cooper and Ogbenna, in which Ogbenna gave Cooper a "weak apology."[2] (Cooper Aff. ¶ 20.)

On February 11, 2013, an incident occurred between Cooper and Ogbenna. Ogbenna was having lunch in the office of Jim Walsh ("Walsh"), MICROS's chief security officer. Cooper alleges that Ogbenna told Walsh that Fidel Castro should be banished to Venezuela, "just like [Cooper.]" (*Id.* ¶ 33.) In response, Cooper raised his middle finger at Ogbenna and told Ogbenna to stop talking about and harassing him. (*Id.* ¶¶ 34-35.) Cooper then followed Ogbenna from Walsh's office to the break room, and asked whether he "wanted to take the argument outside," which Cooper claims was offered solely to avoid disturbing their co-workers. (*Id.* ¶ 38.) When he

---

[1] Ogbenna denies he made the rape comment, or poked Cooper. (Mot. Summ. J. Ex. 3, Ogbenna Dep. 13, 18, ECF No. 32-4.) He also denies he knew Cooper was transgender. (*Id.* at 19-20.)
[2] Cooper, in his deposition, says the meeting occurred sometime in 2011. (Cooper Dep. 246.) Looper says the meeting occurred in 2011. (Mot. Summ. J. Ex. 7, Looper Aff. ¶ 21, ECF No. 32-8.)

received no response, Cooper asked Ogbenna if he "was deaf or too stupid to understand what [Cooper] said." (*Id.* ¶ 41.) Cooper says he "probably" also used verbal profanity. (Cooper Dep. 123.)

Looper conducted an investigation after the incident, in which he interviewed several MICROS employees. (Mot. Summ. J. Ex. 7A, Looper Incident Review, ECF No. 32-8.) Shannon Liggett ("Liggett"), a MICROS employee, said she saw Cooper follow Ogbenna into the break room and angrily yell at him. (*Id.* at 2.) Dennis Hurry ("Hurry"), another MICROS employee, said he heard Cooper curse at Ogbenna in the break room. (*Id.*) After receiving a copy of Looper's report, McIntyre further investigated the incident. (Mot. Summ. J. Ex. 4, McIntyre Aff. ¶ 4, ECF No. 32-5.) It was at this point that Cooper told McIntyre he was transgender, and requested she keep the information confidential. (*Id.* ¶¶ 9, 11.) McIntyre consulted with James Borkowski, vice president of the business services team on which Cooper worked, and Thomas Patz, executive vice president and general counsel, about the February 11 incident. (*Id.* ¶ 12.) On February 13, 2013, they collectively decided that Cooper should be suspended and that he should not be allowed to return to work unless he passed a fitness-for-duty evaluation. (*Id.*) Over the next two weeks, MICROS continued to investigate Cooper's behavior. (*Id.* ¶ 13.) McIntyre says that, during the investigation, she learned of prior confrontations involving Cooper and his co-workers' concerns about his volatile behavior. (*Id.*) On February 25, 2013, Cooper was terminated before undergoing any evaluation. (*Id.* ¶ 14; *see also* Mot. Summ. J. Ex. 9, Termination Letter, ECF No. 32-10.)

## ANALYSIS

### A. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted

"if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Whether a fact is material depends upon the substantive law. *See id.* at 248.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (internal quotation marks omitted).

**B. Discriminatory Discharge Claim**

Cooper alleges that he was terminated because he is transgender, in violation of Title VII, Maryland state law,[3] and Howard County law.[4] Maryland courts "consult[ ] federal precedent in

---

[3] Under Maryland law, an employer may not "fail or refuse to hire, discharge, or otherwise discriminate against any individual with respect to the individual's compensation, terms, conditions, or privileges of employment" on the basis of gender identity. Md. Code Ann., State Gov't § 20-606(a)(1).

[4] The Howard County Code defines discrimination as "acting or failing to act, or unduly delaying any action

4

the equal employment area" because of the lack of applicable state law jurisprudence. *Taylor v. Giant of Maryland, LLC*, 33 A.3d 445, 459 (Md. 2011). Therefore, this court will look to federal law to assess all of Cooper's discrimination claims.

Title VII makes it unlawful to discriminate in employment on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2(a)(1). Where, as in this case, there is no direct evidence of discrimination, such claims are analyzed under the three-pronged, burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, to defeat a defendant's motion for summary judgment, a plaintiff must first make out a prima facie case of discrimination under Title VII. *Lettieri v. Equant Inc.*, 478 F.3d 640, 646 (4th Cir. 2007). If the plaintiff succeeds in carrying out the initial burden, then "the burden shifts to the employer . . . 'to articulate a legitimate, nondiscriminatory reason for the adverse employment action.'" *Id.* (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc)). Once such a reason is provided, the burden shifts back to the plaintiff to demonstrate the given reason was a pretext for unlawful discrimination.[5] *Id.*

1. Prima facie case

To establish a prima facie case of discrimination under the *McDonnell Douglas* pretext

---

regarding any person because of . . . [g]ender identity or expression in such a way that such person(s) are adversely affected in the area of employment." Howard Cnty., Md., Code of Ordinances § 12.208(I)(a). It states that it shall be unlawful for an employer to discharge a person "because of discrimination." *Id.* § 12.208(II)(a)(1).

[5] The Fourth Circuit has explained that a Title VII plaintiff may survive summary judgment either under the mixed-motive framework, "by presenting direct or circumstantial evidence that raises a genuine issue of material fact as to whether an impermissible factor . . . motivated the employer's adverse employment decision," or under the "pretext" framework of *McDonnell Douglas*. *Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). Under the mixed-motive framework, a plaintiff must first make out a prima facie case of discrimination. *Hill*, 354 F.3d at 284. An employer then can limit the remedies available to the employee for the violation by proving it would have made the same decision in the absence of the discriminatory motivation. *Id.* Cooper, in addition to mapping out a pretext case, mentions the mixed-motive analysis in his opposition to MICROS's motion for summary judgment. (Resp. Opp'n Mot. Summ. J., Mem. of Law 17-18, 24, ECF No. 33-5.) This avenue, however, is of no help to Cooper as he has failed to put forth any evidence—direct or circumstantial—upon which a jury could reasonably conclude that discriminatory animus was a motivating factor in MICROS's decision to terminate him. *See Mereish v. Walker*, 359 F.3d 330, 340 (4th Cir. 2004).

framework, Cooper must show that: (1) he is a member of a protected class; (2) he suffered adverse employment action; (3) he was performing at a level that met his employer's legitimate expectations at the time the employer took the adverse employment action; and (4) the position remained open or was filled by a similarly qualified applicant outside the protected class. *Hill*, 354 F.3d at 285; *see also King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003). The parties do not dispute that Cooper has met the first two prongs of the test.[6] This court finds, however, that, even viewing the facts in the light most favorable to him, Cooper cannot meet the third or fourth elements of the test and, therefore, has failed to establish a prima facie case of discrimination.

To determine whether a plaintiff's performance met his employer's legitimate expectations, courts evaluate the performance at the time of the alleged adverse action. *See King*, 328 F.3d at 149. Courts also have recognized that the perception of the decisionmaker, and not the plaintiff's self-assessment, is the relevant inquiry. *Id.* at 149 (stating that a plaintiff's own testimony of satisfactory job performance cannot establish a genuine issue as to whether he was meeting his employer's expectations). MICROS's employee handbook states that "[a]ny form of [workplace] harassment is not tolerated," and lists "intimidation, physical assaults or contact, and/or violence" as non-exclusive forms of harassment. (Resp. Opp'n Mot. Summ. J. Ex. 8, MICROS Employee Handbook 7, ECF No. 33-13.) It also states that, "[w]here behavior or other relevant circumstances raise legitimate questions concerning . . . a potential threat to the safety of fellow employees or others, the Company may find it necessary to investigate current

---

[6] In its motion to dismiss, MICROS pointed out that not all courts recognize discrimination against transgender individuals as a form of sex discrimination protected by Title VII. (Mot. Dismiss, Mem. of Law 6-7, ECF No. 11-1.) That motion was denied as moot, (ECF No. 15), and MICROS does not raise the issue in its motion for summary judgment. Both Maryland state and Howard County law explicitly recognize claims of discrimination on the basis of gender identity. *See* Md. Code Ann., State Gov't § 20-606(a)(1); Howard Cnty., Md., Code of Ordinances § 12.208(I)(a). In this district, Judge Bredar has held that discrimination against transgender individuals is a cognizable claim of sex discrimination under Title VII. *Finkle v. Howard Cnty., Md.*, 12 F. Supp. 3d 780, 788 (D. Md. 2014). A number of other courts agree. *See, e.g.*, *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011); *Smith v. City of Salem*, 378 F.3d 566, 574-75 (6th Cir. 2004). Because neither party argues that discrimination on the basis of gender identity is not protected under Title VII, the court need not address the issue.

employees." (*Id.*) Finally, it says that employee misconduct, including "[f]ighting or [d]isorderly conduct" and "[u]sing abusive or threatening language," is prohibited at MICROS and may result in immediate termination. (*Id.* at 10.)

Here, Cooper admits he: (a) raised his middle finger at Ogbenna, (Cooper Aff. ¶ 34); (b) followed Ogbenna to the break room and asked whether Ogbenna "wanted to take the argument outside," (*id.* ¶ 38), colloquially understood as an invitation to fight; (c) when he received no response, asked Ogbenna if he "was deaf or too stupid to understand what [Cooper] said," (*id.* ¶ 41); and (d) "probably" also used verbal profanity, (Cooper Dep. 123). Cooper claims he never meant to threaten Ogbenna and had no intention of using physical violence, (*id.* at 103), but acknowledged his actions and choice of words could have been perceived as a threat, (*id.* at 76). Cooper also admitted that, if MICROS found he had threatened another employee, it would be a violation of the company's workplace harassment policy. (*Id.* at 86.) Further, Cooper's suspension document stated that MICROS could terminate him regardless of the fitness-for-duty evaluation's outcome. (*Id.* at 126.) Cooper argues that his twenty-five-year tenure at MICROS should be a mitigating factor, but his job performance prior to the adverse employment action is not dispositive. *See Jones v. Dole Food Co.*, 827 F. Supp. 2d 532, 547 (W.D.N.C. 2011). Instead, the court should consider whether Cooper was meeting MICROS's legitimate expectations "at the time the employer took the adverse employment action." *King*, 328 F.3d at 149. At a minimum, Cooper verbally threatened a co-worker, an act which he knew violated company policy and could lead to discharge, and one which MICROS believed warranted discharge. *See, e.g.*, *Jones*, 827 F. Supp. 2d at 547 ("When an employee is aware of an employer's policy and violates it, he has not met the employer's legitimate expectations."); *Farasat v. Paulikas*, 32 F. Supp. 2d 249, 255 (D. Md. 1998) (The plaintiff, who was first suspended and then fired because

7

of his unauthorized entry into the executive offices and his persistent tardiness, "was not at the time of his discharge performing his job at a level which met his employer's legitimate expectations."); *Anders v. Waste Mgmt. of Wis.*, 463 F. 3d 670, 676 (7th Cir. 2006) ("It cannot be disputed that [the plaintiff's] behavior . . . failed to meet [the defendant's] 'legitimate expectations' as established by its Code of Conduct and Workplace Violence policy."). It is not the province of the courts to second guess an employer's reasonable policies, especially when the employee has admitted to the conduct that violates those policies. Therefore, this court finds that Cooper did not meet his employer's legitimate expectations.

Cooper also cannot establish the fourth element of the prima facie case. After his termination, Cooper's responsibilities were distributed among Looper and other business services department employees. (Looper Aff. ¶ 11; Mot. Summ. J. Ex. 6, Borkowski Aff. ¶ 23, ECF No. 32-7.) Accordingly, Cooper has not shown his position remained open or was filled by a similarly qualified applicant outside the protected class. *See, e.g.*, *Causey v. Balog*, 162 F.3d 795, 802 (4th Cir. 1998) (observing that the evidence was insufficient to show the employer filled the plaintiff's position with someone outside the protected class, where the employer split the plaintiff's former duties between two divisions).

In conclusion, even viewing the facts in the light most favorable to him, Cooper has failed to establish a prima facie case of discriminatory discharge.

2. <u>Burden-Shifting Framework</u>

Even if Cooper could establish a prima facie case, MICROS has articulated a legitimate, nondiscriminatory reason for the adverse employment action, and Cooper has not demonstrated that the given reason is a pretext for unlawful discrimination.

Violating company policy has been recognized as a legitimate, nondiscriminatory reason

8

for terminating an employee. *See, e.g.*, *Gibson v. Marjack Co.*, 718 F. Supp. 2d 649, 656 (D. Md. 2010). Here, an employer justifiably would want to take seriously threats of workplace violence; both the employee handbook and his suspension letter put Cooper on notice that termination could result from his behavior. (Cooper Dep. 126; Employee Handbook 10.) Cooper even acknowledged that his conduct could have been perceived as threatening, (Cooper Dep. 76), and that threats against co-workers violate company policy, (*id.* at 86). Accordingly, MICROS has established a legitimate, nondiscriminatory reason for Cooper's termination.

In terms of pretext, Cooper has offered no direct evidence that he in fact was terminated because he is transgender. Although both Looper and McIntyre may have been surprised when Cooper told them he is transgender, there is nothing to support Cooper's claims that they responded unprofessionally. When pressed on his claim that McIntyre's reaction to his disclosure "made [him] feel like that was the worst possible thing that [he] could possibly be," (Cooper Dep. 293), Cooper admits McIntyre said the "politically correct thing" by "acknowledg[ing] gender diversity and the tolerance of it." (Cooper Dep. 332.) She also told him that his being transgender would in no way affect her investigation into the February 11 incident. (*Id.*) Further, although Cooper alleges that all three decisionmakers who fired Cooper knew he was transgender, these are little more than conclusory allegations. (*See id.* at 281 (conceding he was "speculating" about the reasons for his termination because he does not actually know why MICROS made the decision).) Although Cooper may believe that for McIntyre to "keep this shocking information [about Cooper being transgender] from the termination committee seems incredulous," such bare statements unsupported by any evidence do not provide the information necessary to survive summary judgment. (Resp. Opp'n, Mem. of Law 5.) In fact, both Patz and Borkowski have sworn under oath that they had no knowledge or suspicion that Cooper was

9

transgender.[7] (Mot. Summ. J. Ex. 5, Patz Aff. ¶ 9, ECF No. 32-6; Borkowski Aff. ¶ 20.) Looper and McIntyre similarly have submitted affidavits averring they honored Cooper's confidentiality requests, (Looper Aff. ¶ 29; McIntyre Aff. ¶ 11), and Looper was not involved in MICROS's decision to suspend or terminate Cooper anyway, (Looper Aff. ¶¶ 45, 48). Cooper has offered no actual evidence to dispute these claims.

Comparator evidence, or evidence that an employer treats similarly situated employees differently, can serve as indirect evidence of pretext. *See Laing v. Fed. Express Corp.*, 703 F.3d 713, 719 (4th Cir. 2013). Cooper argues that MICROS treated him differently from Ogbenna when it fired him and not Ogbenna, who also was involved in the February 11 incident. The facts of this case are similar to those in *Walker v. Mod-U-Kraf Homes, LLC*, where the plaintiff, aggravated by co-workers' sexual comments, confronted the main perpetrator by "poking" or "punching" her fingers into his chest. 775 F.3d 202, 206 (4th Cir. 2014). The employer in that case terminated the plaintiff as a result of the altercation, but not the other co-worker who was involved. *Id.* The Fourth Circuit found these facts did not establish pretext because the employees were not similarly situated. *Id.* at 211-12. Similarly, here, MICROS "did not view [the involved parties] as 'similarly situated,' nor is there evidence that their roles in the altercation were equal." *Id.* Witnesses, including Liggett and Hurry, stated that Cooper confronted Ogbenna, and Ogbenna, despite being provoked, did not respond to Cooper's entreaties. (Looper Incident Review 2.); *see id.* at 212. Cooper himself acknowledges that his actions and words could have been perceived as threatening to Ogbenna, (Cooper Dep. 123), and

---

[7] And, contrary to his claims, Cooper told McIntyre that he was transgender *before* MICROS made the decision to suspend him, so Cooper's argument that his gender identity is the reason his punishment was converted from suspension to termination has no merit (not to mention that two of the three decisionmakers did not know Cooper was transgender). Further, according to the employee handbook, MICROS would have been justified in terminating Cooper for the February 11 incident alone, regardless of what its investigation after his suspension revealed. (Employee Handbook 10.)

that Ogbenna did not respond to Cooper's provocations, (Cooper Aff. ¶ 41). To establish that he and Ogbenna were sufficiently similarly situated, Cooper must proffer evidence that MICROS, not Cooper, reasonably should have believed that Ogbenna's conduct was on the same level as Cooper's. *See King*, 328 F.3d at 151. Cooper has not done this. Further, in terms of comparator evidence, MICROS has provided evidence to show it terminated another employee, not transgender to anyone's knowledge, who also violated the employee handbook with threats of workplace violence by drawing a cartoon of what appeared to be a bomb or explosion next to the MICROS building. (McIntyre Aff. ¶ 18; Patz. Aff. ¶ 12.) On these facts, Cooper has not established pretext.

Cooper also tries to put forward as comparator evidence MICROS's response to his allegations that Ogbenna said he would rape him and continuously poked him. Cooper alleges that, on November 15, 2010, Ogbenna told Cooper he would rape him. (Cooper Aff. ¶ 15.) Cooper, however, did not tell Looper about this comment, or about Ogbenna's alleged poking, until 2011. (Cooper Dep. 234.) On or about January 2012, Looper held a meeting to address Cooper's allegations. (Cooper Aff. ¶ 20; *but see supra* note 2.) In that meeting, Ogbenna denied poking Cooper or telling Cooper he was going to rape him, but he gave Cooper a "half-grown apology."[8] (Cooper Dep. 253, 260.) Cooper accepted this apology, and was not subject to rape comments again. (*Id.* at 261.) Looper did not discipline Ogbenna because he "did not find Mr. Cooper's uncorroborated allegations . . . to be credible. Mr. Cooper had waited over a year after the incidents allegedly occurred to report them to anyone at MICROS, there were no witnesses to these alleged incidents, and there was no other evidence that these incidents actually occurred." (Looper Aff. ¶ 25.) Cooper's situation after the February 11, 2013, incident, and Ogbenna's

---

[8] Ogbenna says he disputed Cooper's allegations, but "for the sake of good order in the office," apologized for offending Cooper in any way. (Mot. Summ. J. Ex. 8, Ogbenna Aff. ¶ 16, ECF No. 32-9.)

situation after this 2012 meeting are not similar enough for Ogbenna to be considered a comparator for establishing pretext. First, there were no witnesses to support Cooper's allegations, whereas two employees saw or heard the 2013 incident. Second, the two incidents were separated by more than a year. Finally, and importantly, Cooper had not informed Looper at the time of the 2012 meeting that he was transgender. Although Cooper claims that his co-workers "suspected" he was transgender, he has offered no evidence in support of this allegation. (Cooper Aff. ¶¶ 10-13.) Therefore, Looper could not have discriminated against Cooper for being transgender because, at that time, he did not even know that Cooper was transgender.

Not all allegations of workplace misbehavior should or will result in the same discipline. For both incidents involving Cooper and Ogbenna, MICROS responded to the relevant complaints and addressed the respective issues. The Company was entitled to make reasonable credibility calls, and to take more seriously an incident to which there were witnesses and an admission. As the Fourth Circuit has observed, "[i]t is not [a court's] province to decide whether [an employer's] reason [for terminating an employee] was wise, fair, or even correct, ultimately, so long as it truly was the reason for [the employee's] termination." *Walker*, 775 F.3d at 211 (alterations in original) (quoting *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). On these facts, even viewed in the light most favorable to Cooper, no reasonable jury could find that MICROS's decision to terminate Cooper because of the February 11 incident was pretext for a discriminatory motive. Accordingly, the court will grant MICROS's motion for summary judgment.

## CONCLUSION

For the reasons stated above, the defendant's motion for summary judgment will be granted. A separate order follows.

<u>October 27, 2015</u>　　　　　　　　　　　　<u>　　　　　　/s/　　　　　　　</u>
Date　　　　　　　　　　　　　　　　　　Catherine C. Blake
　　　　　　　　　　　　　　　　　　　　United States District Judge